# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
No. 20-254V
Filed: December 16, 2024

| | |
|---|---|
| ANNE MISCHICA,<br><br>               Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Special Master Horner |

*Jessi Carin Huff*, mctlaw, Mercer Island, WA, for petitioner.
*Joseph Douglas Leavitt*, U.S. Department of Justice, Washington, DC, for respondent.

## DECISION AWARDING DAMAGES[1]

On March 6, 2020, petitioner filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10, *et seq.* (2012),[2] alleging that she suffered a Table Injury of Shoulder Injury Related to Vaccine Administration ("SIRVA") in her right shoulder following an influenza ("flu") vaccination that she received on October 9, 2018. (ECF No. 1.) On August 29, 2023, a ruling on entitlement was issued finding petitioner entitled to compensation for her injury. (ECF No. 63.) For the reasons discussed below, I now conclude petitioner is entitled to an award of $95,000.00 in compensation for actual pain and suffering.

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

1

I. **Procedural History**

This case was initially assigned to the Special Processing Unit ("SPU") for potential informal resolution. (ECF No. 12.) Petitioner filed medical records marked as Exhibits 1-12 and an affidavit marked as Exhibit 13. (ECF Nos. 7-8.) She later filed additional medical records marked as Exhibits 14-23 and 27-29. (ECF Nos. 17, 21, 26, 46.) While the case was in the SPU, the parties attempted informal resolution and petitioner filed damages documentation marked as Exhibits 24-26. (ECF No. 37.)

After the parties reported an impasse in settlement discussions, respondent filed a Rule 4 Report, recommending against compensation, and the case was subsequently reassigned to the undersigned for litigation. (ECF Nos. 52-55.) However, after petitioner field an expert report supporting her claim (ECF No. 57-58; Exs. 30-52), respondent filed an amended Rule 4 Report, conceding that petitioner is entitled to compensation for a Table Injury of SIRVA. (ECF No. 62.) A ruling on entitlement based on respondent's concession was issued on August 29, 2023. (ECF No. 63.)

Petitioner then filed further medical records marked as Exhibits 53-63 and an additional declaration marked as Exhibit 64. (ECF Nos. 65-66, 69, 72.) However, the parties reported as of February 21, 2024, that they were unable to informally resolve damages. (ECF No. 75.) Petitioner filed a motion for a ruling on the written record on April 29, 2024, accompanied by a supplemental declaration marked as Exhibit 65. (ECF No. 78.) Respondent filed his response on June 18, 2024, and petitioner filed a reply on June 25, 2024. (ECF Nos. 79, 81.) Petitioner also filed additional medical records. (ECF Nos. 80, 82; Exs. 66-67.)

I have determined that the parties have had a full and fair opportunity to present their cases and that, given the parties' assent, it is appropriate to resolve the appropriate amount of compensation for petitioner's damages on the existing record. *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *see also Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record"). Accordingly, this matter is now ripe for resolution.

II. **Factual History**

a. **Medical Records**

On October 9, 2018, petitioner sought a TB test from her primary care physician, Dr. Michael Cuenca. (Ex. 3, p. 3.) During this appointment, petitioner was administered the flu vaccine at issue in this case. (*Id.* at 5.) Petitioner's phlebotomist, David Gonzalez, later testified that when petitioner presented for her blood draw the next day, she reported that she had received her flu vaccine the day before and began experiencing pain within two hours of her vaccination. (Ex. 12.) Petitioner requested that blood be drawn from her left arm to prevent any further discomfort. (*Id.*)

2

Petitioner presented to Dr. Cuenca on November 19, 2018, and reported "severe pain and difficulty in moving her arm within 2 hours of a clinic administered flu shot." (Ex. 3, p. 12.)  Petitioner explained that she had treated with a cold compress, and attempted her own physical therapy; however, her pain did not improve. (*Id.*)  She reported right shoulder pain that radiated to the cervical area of her neck and finger numbness. (*Id.*)  Petitioner's physical exam revealed "[l]imit[ed] range of motion secondary to pain at raising of hand to 180 degrees," and "[no] limitation on abduction." (*Id.* at 13.)  Dr. Cuenca noted that petitioner likely suffered from a SIRVA, referred her for a possible intra-articular injection, and requested an MRI. (*Id.*)  Additionally, he prescribed Voltaren gel. (*Id.*)

Petitioner underwent an MRI on February 12, 2019, and the impression was reported as adhesive capsulitis and a partial tear of the rotator cuff, in addition to "[b]one marrow edema of the posterior lateral humeral head" and "[e]dema in the overlying teres minor tendon and deep fibers of the deltoid muscle." (Ex. 6, p. 3.)  It was reported that these "could represent sequela of SIRVA after injection." (*Id.*)  Petitioner had a follow up appointment with Dr. Cuenca on April 26, 2019, and confirmed that petitioner had developed adhesive capsulitis as a result of "a severe injection reaction to vaccine administration." (Ex. 7, p. 14.)  Petitioner reported that she continued to perform physical therapy exercises at home and scheduled an appointment to begin physical therapy and rehab in May. (*Id.*)  Petitioner expressed that she was willing to have an intra-articular injection if needed. (*Id.*)  On May 31, 2019, petitioner had her first physical therapy appointment with Amir Rahnavard, M.D. (Ex. 3, p. 20.)  She reported her pain was a 3/10, however, her pain increased to a 5/10 when sleeping. (*Id.*)  Petitioner's range of motion was "limited in shoulder flexion due to posterior scapular pain." (*Id.* at 22.)  Petitioner received an intra-articular injection during this visit. (Ex. 7, pp. 32-34.)

On September 18, 2019, petitioner saw Nurse Practitioner ("NP") Joseph Milly following a car accident and reported pain and stiffness in her neck and back, along with muscle spasms. (Ex. 18, p. 6.)  NP Milly recommended physical therapy for this injury. (*Id.* at 7, 9.)  Petitioner underwent an electromyography ("EMG") on October 16, 2019. (Ex. 9.)  The study found a "decrease in the conduction velocity of the right ulnar nerve at the wrist and evidence of focal slowing of the ulnar nerve just proximal to the medial epicondyle." (*Id.* at 2.)  Additionally, there were "abnormal EMG findings in the flexor carpi ulnaris muscle but also in the teres minor and deltoid muscles." (*Id.*)  The report noted that petitioner's symptoms "may be part of the patient's SIRVA." (*Id.*)  Petitioner began physical therapy on October 18, 2019. (Ex. 5, pp. 10-14; Ex. 11, pp. 18-22.)  Her muscle testing revealed decreased right-sided shoulder abduction, shoulder external and internal rotation, and elbow flexion, along with decreased range of motion. (Ex. 5, p. 10.)

Petitioner had an appointment with orthopedic surgeon Richard Ravalin, M.D., on October 22, 2019. (Ex. 8, pp. 2-4.)  Petitioner explained the course of her condition and reported that she felt no sensation in her hand at times. (*Id.* at 2.)  Petitioner noted that she still used Voltaren gel and Advil to treat her pain. (*Id.*)  Her physical exam revealed

3

continued limited active range of motion, but her passive range of motion was normal. (*Id.*)  Dr. Ravalin stated that he did not think petitioner was a candidate for surgery and recommended continuing with conservative treatment.  (*Id.* at 4.)  Petitioner continued with physical therapy and attended nine sessions from October 2019 to February 2020, during which her maximum pain was reportedly a 7/10.  (Ex. 11, pp. 3-6, 8-11, 13-16; Ex. 15, pp. 4-13.)  By February 7, 2020, petitioner's range of motion was nearly normal, with only a slightly decreased shoulder external rotation.  (Ex. 15, p. 12.)

Throughout 2020, 2021, and into 2022, petitioner was treated for various conditions that are not relevant to this matter.  (Ex. 23, pp. 9-12, 61-68; Ex. 28, pp. 3-28, 59-116; 130-38, 168-69; Ex. 55, pp. 86-108.)  On July 6, 2022, petitioner returned to physical therapy with Dr. Rahnavard.  (Ex. 55, p. 109.)  Petitioner reported that she experienced some relief with an injection but had also noticed some discomfort that disrupted her sleep.  (*Id.*)  Petitioner additionally noted that she felt further discomfort after lifting a five-pound bag.  (*Id.*)  Petitioner's physical exam revealed that her upper extremities were fully intact and normal.  (*Id.* at 110.)  Dr. Rahnavard reported that petitioner experienced eight months of pain in her "right shoulder that has evolved [to] posterior scapular region and radiates down the medial side of the right arm down to the fingers of the right hand."  (*Id.* at 112.)  Additionally, Dr. Rahnavard noted that petitioner's symptoms were a continuation of her SIRVA injury.  (*Id.*)  Petitioner received a second intra-articular injection during this visit.  (*Id.* at 114.)  Dr. Rahnavard recommended an MRI, if petitioner's symptoms persisted over the next two months.  (*Id.* at 112.)

On June 13, 2023, petitioner underwent an MRI of her right shoulder that showed both "[m]ild tendinopathy and partial tearing of the supraspinatus portion of the rotator cuff" and "[m]ild degenerative changes within the acromioclavicular joint," in addition to a "[p]robable small SLAP tear of the glenoid labrum."  (Ex. 56, pp. 7-8.)  Petitioner had a consultation with orthopedic surgeon Samera Kasim, D.O., on July 21, 2023.  (*Id.* at 10-14.)  Petitioner described a dull, but sometimes sharp, pain "on the top and lateral and bicep aspect of the shoulder."  (*Id.* at 10.)  After observing a normal range of motion on physical examination and reviewing petitioner's MRI, Dr. Kasim opined that petitioner's symptoms were consistent with the natural course of the injury and encouraged her to pursue conservative treatment, including NSAID, injections, diclofenac, and physical therapy, before considering surgery.  (*Id.* at 13.)  While it was noted that surgery is sometimes needed to resolve this injury, it was also noted that petitioner's MRI showed no "major surgical indications."  (*Id.*)  Petitioner began physical therapy on August 5, 2023, attending nine sessions before being reevaluated by Dr. Kasim on October 12, 2023.  (Ex. 67, pp. 3-12; Ex. 63.)  At the October 12, 2023 appointment, petitioner reported that her pain was improving.  (Ex. 63, p. 2.)  After examination, Dr. Kasim noted that petitioner had good range of motion and strength, though she continued to have "same pain overlapping from her rotator cuff."  (*Id.* at 5.)  Dr. Kasim noted that petitioner planned to continue physical therapy and hold off on any further injections.  (*Id.*)  Petitioner attended 15 physical therapy appointments before she was reevaluated by Dr. Kasim on April 1, 2024.  (Ex. 67, pp. 13-20; Ex. 66.)  At her reevaluation, petitioner reported intermittent moderate to sharp pain.  (Ex. 66, p. 4.)  Dr. Kasim

4

reported that petitioner continued to have good strength and range of motion and recommended that petitioner continue to pursue conservative treatment with physical therapy. (*Id.* at 7.) Petitioner attended three more physical therapy appointments throughout April and May of 2024. (Ex. 67, pp. 20-21.) During petitioner's initial evaluation, petitioner reported a maximum pain of 7/10 and some limited range of motion. (*Id.* at 3, 5-6.) These symptoms continued through her last reported appointment on May 25, 2024. (*Id.* at 21.)

### b. Testimony

Petitioner submitted three affidavits in this case. (Exs. 13, 64, 65.) In her affidavits, petitioner detailed her medical course as described above. (Ex. 13, ¶¶ 5-24; Ex. 65, ¶¶ 13-16.) In addition to describing her medical course, petitioner noted the impact that the subject vaccination has had on her life. Before her injury, petitioner testified that she was very active and enjoyed running, dancing, and playing tennis. (Ex. 13, ¶¶ 4, 25.) After her injury, petitioner has "not returned to dance classes, swimming, playing tennis, or riding [her] bicycle," and her ability to perform basic tasks, such as vacuuming, dressing, writing, and brushing her teeth, has been affected. (*Id.* ¶¶ 25, 28; Ex. 65, ¶ 18.) Additionally, petitioner's SIRVA has affected both her ability to work by limiting the care she can provide as a physician and her sleep. (Ex. 13, ¶ 27; Ex. 64, ¶ 2; Ex. 65, ¶ 19.) Finally, petitioner explained that her injury affected her self-confidence as she has been unable to go back to what she loved. (Ex. 13, ¶ 26.)

Petitioner testified that she continues to undergo physical therapy; however, her orthopedic surgeon had noted that if petitioner's pain continues, she will require a third steroid injection. (Ex. 64, ¶ 8.) Her surgeon is concerned about providing this injection, given petitioner's compromised shoulder. (*Id.*) She testified that her orthopedic surgeon has noted that she is not a surgical candidate. (*Id.* ¶¶ 9-10.) However, petitioner later averred that she began seeing another orthopedic surgeon who told her that her shoulder may require surgery, and that her "physicians are all in agreement that the only solution left for [her] is surgical." (Ex. 65, ¶ 22.)

### III. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 300aa-15(a)(4). Additionally, a petitioner may recover for unreimbursable expenses and loss of earning capacity. § 300aa-15(a)(1)-(3). In this case, however, petitioner requests only compensation for her pain and suffering. (ECF Nos. 78, 81.) The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (reasoning that

"[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) (concluding that "the assessment of pain and suffering is inherently a subjective evaluation"). In general, factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Human Servs.*, No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may also consider prior awards when determining what constitutes an appropriate award of damages. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"); *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (explaining that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, while potentially persuasive, decisions regarding prior awards are not binding. *See Nance v. Sec'y of Health & Human* Servs., No. 06-0730V, 2010 WL 3291896, at *8 (Fed. Cl. Spec. Mstr. July 30, 2010); *Hanlon v. Sec'y of Health & Human Servs.*, 40 Fed. Cl. 625, 630 (1998) ("Special masters are neither bound by their own decisions nor by cases from the Court of Federal Claims, except, of course, in the same case on remand."), *aff'd*, 191 F.3d 1344 (Fed. Cir. 1999).

Based on prior experience within the SPU as of the beginning of 2024, the overall spectrum of proffered SIRVA awards extends from $10,000.00 to $1,845,047.00. *Langner v. Sec'y of Health & Human Servs.*, No. 20-1965V, 2024 WL 3422749, at *3 (Fed. Cl. Spec. Mstr. June 11, 2024). Eliminating outliers, the first and third quartiles span from $61,338.13 to $110,000.00. (*Id.*) The median is $81,049.85. (*Id.*) Damages awards based on decisions by special masters run slightly higher, with the first and third quartile range being from $70,000.00 to $125,007.45 and a median of $88,974.23. (*Id.*)

## IV. Party Contentions

### a. Petitioner's Motion

Petitioner requests $110,000.00 for pain and suffering, as well as an additional $10,000.00 in future pain and suffering for an impending surgery. (ECF No. 78, p. 9.) In support of this request, petitioner encourages the Court to consider petitioner's medical records and testimony. (*Id.* at 9-10.) Specifically, petitioner explains that she "has been dealing with her pain and reduced range of motion from her vaccine injury for almost 6 years now." (*Id.*) She has attended 30 physical therapy appointments, received two steroid injections, and undergone two MRIs and an EMG. (*Id.*) Petitioner's treatment is ongoing. (*Id.*) Additionally, petitioner has testified to the impact her condition has had on her personal and professional life. (*Id.* at 9-10.) She has had

6

to give up dancing, and her injury has affected her sleep and limited her ability to work as a physician.  (*Id.*)

In light of the facts of this case, petitioner also argues that her requested award is reasonable and consistent with prior SIRVA awards.  (ECF No. 78, pp. 8-9.)  Specifically, petitioner cites the following reasoned decisions as reflecting comparable facts: *Dhanoa v. Secretary of Health & Human Services*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $85,000.00 for actual pain and suffering and $10,000.00 for future pain and suffering); *Cooper v. Secretary of Health & Human Services*, No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for actual pain and suffering); *Young v. Secretary of Health & Human Services*, No. 15-1241V, 2019 WL 396981 (Fed. Cl. Spec. Mstr. Jan. 4, 2019) (awarding $100,000.00 for actual pain and suffering); *Binette v. Secretary of Health & Human Services*, No. 16-0731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $130,000.00 for actual pain and suffering); *Fry v. Secretary of Health & Human Services*, No. 18-1091V, 2020 WL 8457671 (Fed. Cl. Spec. Mstr. Dec. 16, 2020) (awarding $120,000.00 for actual pain and suffering).  (*Id.*)

### b. Respondent's Response

Respondent proposes an award of $70,000.00 in total for damages.  (ECF No. 79, p. 15.)  Respondent points out that petitioner "experienced a moderate clinical progression and treatment course for SIRVA" and that petitioner only underwent conservative medical treatment.  (*Id.* at 8-9.)  Additionally, respondent notes that petitioner's "medical records reflect multiple long gaps in treatment" and, therefore, she was only actively treated for 11 out of 60 months, suggesting that "petitioner's pain was not persistent and ongoing in a way that it interfered with petitioner's life."  (*Id.*)  Specifically, respondent noted that petitioner was first treated a month after her flu vaccine, on November 19, 2018.  (*Id.* (citing Ex. 3, p. 12).)  Petitioner underwent an MRI in February; however, after this initial treatment, she did not seek treatment again until April 26, 2019.  (*Id.* (citing Ex. 3, p. 23).)  Additionally, respondent points out that petitioner has had multiple gaps in treatment.  (*Id.*)  First, following her May 31, 2019 appointment, petitioner did not seek treatment until October 18, 2019.  (*Id.* at 8.)  Second, following her February 7, 2020 appointment, petitioner did not seek care for her shoulder again until July 6, 2022.  (*Id.* at 9.)  Finally, following the July 6, 2022 appointment, petitioner did not seek care for her shoulder again until June 13, 2023.  (*Id.*)

Respondent contends that the prior SIRVA awards cited by petitioner are distinguishable.  (ECF No. 79, pp. 9-13.)  Specifically, respondent argues that when compared to the *Dhanoa* petitioner, petitioner in this case "had much longer and more frequent gaps in treatment," and the petitioners in *Cooper*, *Young*, *Binette*, and *Fry* had a more active treatment without significant gaps.  (*Id.* at 10-13.)  Additionally, respondent notes that the petitioners in *Young* and *Binette* rated their pain higher than the petitioner in this case.  (*Id.* at 11-12.)  Also, unlike petitioner in this case, the petitioner's injury in *Binette* was permanent and inoperable.  (*Id.*)  Finally, the petitioner

7

in *Fry* could not receive certain treatment modalities that would have helped her pain due to her advanced age. (*Id.* at 12-13.) Petitioner here had no similar limitation on her treatment. (*Id.* at 13.)

Respondent cites three cases that he argues are more comparable to petitioner's case. (ECF No. 79, pp. 13-15.) Specifically, respondent cites *Horton v. Secretary of Health & Human Services*, No. 20-1166V, 2022 WL 1421847 (Fed. Cl. Spec. Mstr. Mar. 25, 2022) (awarding $60,000.00 for actual pain and suffering); *Bartholomew v. Secretary of Health & Human Services*, No. 18-1570V, 2020 WL 3639805 (Fed. Cl. Spec. Mstr. June 5, 2020) (awarding $67,000.00 for actual pain and suffering); *Deutsch v. Secretary of Health & Human Services*, No. 18-0527V, 2023 WL 2756217 (Fed. Cl. Spec. Mstr. Apr. 3, 2023) (awarding $70,000.00 for actual pain and suffering). (*Id.*) Respondent contends that, while petitioner in this case had a longer course of treatment, the petitioners in *Horton* and *Bartholomew* reported their shoulder pain earlier and their treatment course did not have any significant gaps. (*Id.* at 13-14.) Respondent additionally explains that petitioner's course of treatment was most similar to the *Deutsch* case, where the petitioner waited a month before reporting pain, had similar amounts of physical therapy, and had significant gaps in treatment; however, the *Deutsch* petitioner received two more steroid injections and had less significant gaps in treatment than the petitioner in this case. (*Id.* at 14-15.)

### c. Petitioner's Reply

Petitioner indicates that the "significant gaps" in her treatment identified by respondent can be explained by her ability to self-treat as a physician, relief after a steroid injection, and other unrelated medical conditions that required petitioner's attention. Therefore, her gaps in treatment are not indicative of the severity of her condition as respondent contends. (ECF No. 81, pp. 1-3.) Petitioner also contends that, after her injury was first confirmed by MRI in 2019, the results of the 2023 MRI demonstrate that her injury persisted despite treatment. (*Id.* at 3.) Petitioner further notes that Dr. Kasim, one of her treating physicians, informed her in July of 2023 that her condition may require surgery. (*Id.* at 3-4 (citing Ex. 56, p. 13).) Additionally, petitioner notes that her condition has continued to require treatment up until as recently as April of 2024, and that she was recently referred for additional physical therapy and platelet rich plasma therapy. (*Id.* at 4 (citing Ex. 66, p. 7).)

The gaps in treatment that respondent contends differentiate petitioner's case from *Dhanoa* can, again, be explained by self-treatment and the fact that petitioner was seeking treatment for unrelated conditions. (ECF No. 81, pp. 4-5.) Additionally, petitioner contends that, when compared to the petitioners in *Dhanoa*, *Cooper*, *Young*, *Binette*, and *Fry*, her injury course was longer and her treatment was more intensive. (*Id.* at 5-7.) Petitioner also notes that, while the petitioner in *Fry* was unable to have surgery due to her age, the facts of that case remain comparable to petitioner's because petitioner may require surgery in the future. (*Id.* at 7.) In contrast, petitioner argues that, in both *Horton* and *Bartholomew*, the duration of injury was eight months, which is significantly less than petitioner's six-year course of injury in this case. (*Id.* at 7-8.)

8

Additionally, petitioner in this case may require further injections and possibly surgery in the future, whereas the petitioner in *Horton* only received one injection. (*Id.*) Petitioner acknowledges that the *Deutsch* petitioner had an injury course of four years; however, she notes that, after those four years, the *Deutsch* petitioner had relief from symptoms, while the petitioner in this case still remains symptomatic after six years and may require additional treatment, such as surgery. (*Id.* at 8-9.)

V.     **Analysis**

   a. **Actual pain and suffering**

I am mindful of prior decisions regarding damages for SIRVA, including those cited by the parties. However, I do not merely rely on any prior decision to determine the amount of petitioner's damages in this case. Instead, I have reviewed previous SIRVA awards, the arguments presented by the parties, and the totality of the evidentiary record. The primary considerations informing pain and suffering in SIRVA cases is the severity and duration of the shoulder pain. Numerous aspects of a petitioner's medical history potentially speak to these issues, including the total duration of the petitioner's pain, the total duration of petitioner's reduced range of motion, the length of time over which the petitioner actively treated the condition, the duration and outcome of physical therapy, the modalities of treatment (*e.g.*, steroid injections, surgeries, etc.), the severity of MRI or surgical findings, subjective reports of pain levels, and the ultimate prognosis.

In this case, although respondent notes a delay in seeking treatment and three substantial gaps in petitioner's treatment, he does not dispute that petitioner's pain and suffering spanned 60 months. (ECF No. 79, pp. 8-9.) Instead, he relies on these gaps to draw attention to the severity of petitioner's injury by noting that petitioner was only actively treated for 11 of those 60 months. (*Id.*) In that regard, petitioner contends that the gaps in treatment are at least partly explained by her ability to self-treat and her attention to unrelated medical issues. (ECF No. 81, pp. 1-3.) However, even accounting for these factors, the gaps in treatment on this record do evidence periods of significant relief. *Accord Ratzlaff v. Sec'y of Health and Human Servs.*, No. 18-1017V, 2023 WL 4072909, at *8-9 (Fed. Cl. Spec. Mstr. May 24, 2023) (concluding that, despite petitioner's explanations for gaps in treatment, the medical records evidenced that petitioner's cessations of treatment correlated to periods of significant recovery with only mild to moderate symptoms). For example, the first and third gaps described by respondent (from May 2019 to October 2019 and July 2022 to June of 2023, respectively) took place after petitioner received steroid injections, suggesting she experienced relief after this treatment. Indeed, petitioner argues exactly that. (ECF No. 81, pp. 2-3.) The second gap in treatment identified by respondent, from around February 2020 until July 2022, occurred after a physical therapy encounter at which petitioner's range of motion was nearly normal with only a slightly decreased shoulder external rotation and her pain was a 0/10 at best. (Ex. 15, p. 12.) Thus, these gaps in treatment do reduce the amount of the award as a matter of the severity of petitioner's ongoing condition even as they remain consistent with a finding that the overall duration

of petitioner's pain and suffering was 60 months. Over the course of her 60-month treatment, petitioner experienced a period of moderate pain for about 15 months, followed by mild pain beginning in February of 2020, and for which she continues to seek treatment.

      Several of the cases cited by the parties are not helpful in resolving the appropriate amount of damages in this case. This petitioner had significantly longer and more involved treatment than either the *Horton* or *Bartholomew* petitioners referenced by respondent. *Horton*, 2022 WL 1421847, at *5 (noting that petitioner attended eight physical therapy sessions over four months and seeing resolution at eight months after a cortisone injection); *Bartholomew*, 2020 WL 3639805, at *3 (noting that petitioner's injury resolved after eight months and one cortisone injection). In contrast, the *Binette* and *Fry* petitioners referenced by petitioner had more severe, inoperable conditions. *Binette*, 2019 WL 1552620, at *14; *Fry*, 2020 WL 8457671, at *6-7. The *Fry* and *Cooper* petitioners also had extenuating circumstances not present in this case. *Fry*, 2020 WL 8457671, at *6-7 (noting a higher award because petitioner was unable to undergo surgery due to advanced age); *Cooper*, 2018 WL 6288181, at *13 (finding petitioner had structured her life around sailing, which she could no longer do following her SIRVA).

      While still distinguishable in many respects, the two most comparable case cited by the parties are *Deutsch*, in which the petitioner was awarded $70,000.00 in actual pain and suffering, and *Dhanoa,* in which the petitioner was awarded $85,000.00 for actual pain and suffering and $10,000.00 for projected pain and suffering. In *Deutsch,* the petitioner sought treatment for nearly four years, with four gaps in treatment ranging from roughly three months to two-and-a-half years. 2023 WL 2756217, at *1-3. He described his pain as oscillating depending on activity, and he received three cortisone injections that corresponded to three gaps in his treatment history, though he later returned to physical therapy. He completed a total of 15 sessions of physical therapy. *Id.* In *Dhanoa*, the petitioner attended 19 physical therapy sessions without experiencing much relief from her symptoms and, specifically, continually described her pain as a 10/10. 2018 WL 1221922, at *3-4. After a six-week gap, the petitioner returned for four physical therapy sessions before ending her physical therapy treatment for a year. *Id.* at *4. During this time, she continued to experience severe pain and limited range of motion. *Id.* While petitioner did exhibit limited improvement over the course of her treatment, she still reported moderate pain. *Id.* at *4-5. The *Dhanoa* petitioner received two therapeutic injections to treat her pain. *Id.* at *3-5. At the time of the decision, the *Dhanoa* petitioner had experienced three and a half years of pain and suffering, continuing to experience pain limited range of motion. *Id.* at *5-6.

      However, two prior cases, one of which was cited by petitioner, also suggest that some consideration should be given to the fact that petitioner was in position to self-treat. In *Young*, the petitioner, a physician, sought treatment for his SIRVA injury five months after receiving the vaccine. 2019 WL 396981, at *2-3. After the initial visit, the petitioner pursued formal treatment for three months, during which he reported his pain

10

to be 10/10.  *Id.*   After pausing formal treatment, petitioner continued to self-treat.  *Id.*  After three years, petitioner had an exacerbation of symptoms and returned to formal treatment.  *Id.*  Petitioner received an award of $100,000.00 for actual pain and suffering.  *Id.* at *6.  In *Accetta,* the petitioner initially delayed seeking treatment because, as a retired physical therapist, she "initially attempted home exercises to treat her pain."  *Accetta v. Sec'y of Health & Human Servs.*, No. 17-1731V, 2021 WL 1718202, at *3 (Fed. Cl. Spec. Mstr. Mar. 31, 2021).  Additionally, petitioner's treatment course contained two treatment gaps, the first stretching three-and-a-half years and the second stretching a year.  *Id.* at *5.  Before her gaps in treatment, petitioner pursued formal physical therapy for approximately three months.  *Id.* at *3.  Despite petitioner's delay in seeking treatment and gaps in treatment, the special master determined that her course was "moderately more severe" than other petitioners, particularly petitioners who had not undergone surgery.  *Id.*  Additionally, the fact that the *Accetta* petitioner's treating physicians had only recommended surgery and petitioner had, understandably, delayed seeking this more invasive treatment, "undercut[] her allegations of its severity, and therefore support[ed] a lesser pain and suffering award."  *Id.* at *5.  Taking into consideration petitioner's long treatment course, which extended over five years, balanced with the gaps in treatment, petitioner was awarded $95,000.00.  *Id.*

Considering all of the above, I find that an award of $95,000.00 represents reasonable compensation for petitioner's past pain and suffering.

### b. Future pain and suffering

In addition to petitioner's award for actual pain and suffering, she requests an additional $10,000.00 for a possible impending surgery.  (ECF No. 78, pp. 9-10.)  Future pain and suffering is only appropriate in cases "where a strong showing is made that the claimant has suffered a permanent disability, or there are other extenuating circumstances that justify inclusion of a future component."  *Accetta*, 2021 WL 1718202, at *5.  In SIRVA cases, future pain and suffering requires "adequate medical evidence demonstrating the likelihood that petitioner's shoulder injury, more likely than not, will extend well into the future."  *Reed v. Sec'y of Health & Human Servs.*, No. 16-1670V, 2019 WL 1222925, at *17 (Fed. Cl. Spec. Mstr. Feb. 1, 2019).  For example, in *Brandt v. Secretary of Health & Human Services*, the petitioner's primary care physician noted that he may consider surgery in the future if the pain that petitioner was reporting as "manageable" ever became "unmanageable."  No. 21-0494V, 2023 WL 10353958, at *5 (Fed. Cl. Spec. Mstr. June 14, 2023).  The chief special master found that one mere recommendation of surgery did not mean that surgery was required, and future pain and suffering was not awarded.  *Id.* at *6.

Here, petitioner contends that her care is ongoing and that surgery has been recommended as a possible, and potentially only, treatment option.  Therefore, she requests $10,000.00 for future pain and suffering.  (ECF No. 78, pp. 9-10.)  Petitioner avers that "[m]y physicians are all in agreement that the only solution left for me is surgical."  (Ex. 65, ¶ 22.)  However, this is not supported by the medical records.  In the most recent medical record available, petitioner reported to Dr. Kasim as of April 2,

11

2024, that "PT has been helping her mobility" (Ex. 66, p. 4), and Dr. Kasim advised petitioner that "I do not see anything surgical on her MRI at this time, and recommend she exhaust conservative treatment prior to considering surgery" (*Id*. at 7). Elsewhere in her affidavit, petitioner indicates Dr. Kasim has said that she "might" need surgery. (Ex. 65, ¶ 15.) However, even if accepting that representation, "might" is equivocal and does not imply that surgery is more likely than not, especially when read in conjunction with Dr. Kasim's actual medical records that counsel against considering surgery at this time.

## VI.     Conclusion

In light of the above, **I award petitioner a lump sum payment of $95,000.00 for actual pain and suffering in the form of a check payable to petitioner**. This amount represents compensation for all damages available under § 300aa-15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[3]

**IT IS SO ORDERED.**

                                                      **s/Daniel T. Horner**
                                                    Daniel T. Horner
                                                    Special Master

---

[3] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.